THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT C. BLEITNER, Defendant-Appellant.

Fourth District   No. 4—88—0944

Opinion filed October 5, 1989.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Nathan P. Maddox, Assistant Attorneys General, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a jury trial in Adams County, the defendant, Robert C. Bleitner, was convicted of unlawful use of weapons (Ill. Rev. Stat. 1987, ch. 38, par. 24—1(a)(7)), conspiracy to commit murder (Ill. Rev.

Stat. 1987, ch. 38, par. 8—2(a)), and attempt (first degree murder) (Ill. Rev. Stat. 1987, ch. 38, par. 8—4(a)). Defendant was sentenced to concurrent terms of imprisonment of 28 years for the offense of attempt (first degree murder) and 5 years for the offense of unlawful use of weapons. No sentence was imposed on the conspiracy offense. Defendant has appealed contending: (1) the trial court erred in finding him fit to stand trial; (2) the initial stop and search of his automobile by the police was improper; and (3) evidence of motive was erroneously admitted.

The convictions arose from a June 2, 1988, attempt by defendant to place a pipe bomb on the car of Charles H. Burch, Calhoun County's State's Attorney. The evidence presented at trial showed in March of 1988, Burch began an investigation of defendant for the criminal sexual assault of defendant's 17-year-old stepdaughter. This investigation resulted in an indictment on April 29, 1988. Thereafter, defendant's wife, Theresa Bleitner, sent her other two minor daughters to a shelter home. The girls had previously resided with Theresa Bleitner and defendant though they were the subject of a juvenile neglect proceeding.

Defendant expressed his aggravation resulting from the neglect proceedings and the charges of sexual assault to the children's guardian *ad litem*, John W. Guntren. Defendant told Guntren he had made a "list" of people to "get," which included the judge presiding over these matters; Charles Burch, the State's Attorney; several employees of the Department of Children and Family Services; and the attorneys involved in these cases. In discussing what he meant by his statements, defendant declared they would all be sorry. After unsuccessfully attempting to file criminal charges against Burch for his actions in the sexual assault and neglect cases, defendant stated to Guntren he was going to make Burch number one on his list.

To determine where Burch resided, defendant followed a car driven by Burch's wife to their rural residence located outside Hamburg, Illinois, on the bluffs of the Mississippi River near the intersection of county road No. 2 and Sunset Road. From the information obtained, defendant drew a map of the area which he used in coordinating his plan. Defendant's plan was to tape the pipe bomb which he had made to the gas tank of the State's Attorney's Ford Escort and to affix a heat sensor to the tail pipe. Defendant discussed his plans with his 18-year-old son, Robert H. Bleitner, and his son's 15-year-old friend, who was then living with the Bleitners. Defendant told his son the bombing was because of the sexual assault case.

On the evening of June 1, 1988, defendant's wife and minor friend

drove defendant and his son to a location within one or two miles of where Burch resided. Upon letting defendant and his son out of the car, she and the minor returned to their home. The defendant and his son were wearing camouflage clothing and camouflage paint on their faces and hands. They entered Burch's property through a wheat field carrying a homemade pipe bomb, duct tape, wire cutters, binoculars, and a marine hand-held radio. Part of the way into the property defendant instructed his son to wait in the shadow of a utility pole and to keep a lookout for the State's Attorney with his binoculars. Defendant proceeded toward the residence by crawling through the wheat field.

As defendant approached the residence, Burch's dog, which was outside, started barking loudly and constantly. At about 11:25 p.m., Burch ultimately came outside to investigate, but finding nothing wrong, returned inside his home. As a result, defendant aborted his plan to attach the bomb to the car at that time. Defendant returned to his son's location at the utility pole and they exited Burch's property. On the way out, defendant removed the cover from a utility pedestal and randomly cut telephone wires. By using a prearranged signal over the hand-held radio, defendant summoned his wife to drive to the area to pick up himself and his son. The defendant's wife and the minor left their home and drove the same route to retrieve defendant and his son.

Due to other unrelated investigations, Calhoun County police had the Bleitner residence under surveillance that evening. The Bleitner residence is located in Hamburg, a small village of approximately 300 people located near the Mississippi River. The officers began their surveillance at approximately 1 a.m. on June 2, 1988. At 1:40 a.m., the house lights extinguished. Defendant's wife and the minor exited the residence, entered their car and drove off. The police followed them with their squad car lights off. The Bleitner vehicle proceeded south on county road No. 2. After approximately 22 miles and 50 minutes of driving, the Bleitner car stopped and the dome light came on for about 20 seconds. The car had stopped approximately 200 feet from a farm house and machine shed. The defendant's car proceeded in the same direction for a little way, turned around and headed back toward town. At this time, the officers activated their headlights and flashing red lights and stopped the vehicle. When the vehicle was stopped, the officers discovered defendant and his son had joined Theresa Bleitner and the minor in the car. Defendant and his son were wearing camouflage clothes and camouflage paint. In plain view on the front seat between defendant and his wife was a pipe bomb in a clear plastic bag. When

defendant left his car as ordered, the officers seized the bag.

Upon processing the defendant and his family at headquarters, the police tried to telephone Burch, as they knew his residence was nearby. Upon being unable to do so, they went to his house and awakened him. At daybreak, the police and Burch observed a fresh path from the driveway to the road through the wheat field. Eventually the cut telephone wires were discovered and repaired. A crime lab expert matched the cut wires to pliers attributed to defendant.

Other evidence at trial disclosed the bomb was live, functional as connected, and capable of exploding. Items seized from the defendant's house and car, pursuant to a search warrant, produced similar component parts for comparable bombs.

We now address the issues raised by defendant. Fitness to stand trial has two aspects. To be fit, a defendant must be able (1) to understand the nature and purpose of the proceedings against him and (2) to assist in preparing in his defense. (Ill. Rev. Stat. 1987, ch. 38, par. 104–10.) No question is raised about the first part of the standard. All witnesses stated defendant understood the nature of the proceedings, and defendant does not contend otherwise. The only question concerns defendant's ability to assist in his own defense.

Defendant was examined by Drs. Domino and Griffith. Dr. Griffith is a third-year resident in psychiatry who worked under Dr. Domino's supervision. Their report was prepared in conjunction and each reached the same conclusion. The doctors found defendant unfit to stand trial, stating defendant suffers from manic episodes and a paranoid personality disorder. In their opinion, such illnesses would prevent defendant from fully cooperating with his attorney due to lack of candor or the supplying of misleading information. Dr. Domino testified at the fitness hearing and confirmed the report.

Relying on *People v. Williams* (1980), 87 Ill. App. 3d 860, 490 N.E.2d 439, defendant contends the trial court erred in rejecting the sole medical evidence and in substituting its own personal observations. The only evidence received in *Williams* regarding the defendant's fitness was from two psychiatrists who found defendant unfit. The Second District Appellate Court held such a rejection was not warranted merely from the court's exposure to defendant or from its commonsense interpretation of psychiatric opinions. Unlike *Williams*, additional evidence on the issue of defendant's fitness was presented in the case at bar.

In terms of other evidence, the State presented lay witnesses who testified as to defendant's fitness. Deputy Atterberry, a jailer and dispatcher at the Calhoun County jail, testified to numerous phone calls

and visits between defendant and his attorney. He also testified that after communicating with his attorney, defendant would want to share the information with other family members. Atterberry testified about his personal contacts with defendant and gave the opinion defendant knew exactly what was going on and felt he was going to get away with what he had done. He also expressed the opinion defendant was able to assist his attorney. Calhoun County Sheriff Stacy Ferguson testified about his contacts with defendant and expressed the opinion defendant understood the nature of the proceedings against him and was able to assist in his defense. Ferguson noted defendant always prepared a list or notes prior to communicating with his attorney. The State also introduced defendant's sworn testimony at the bail-reduction hearing as evidence of his fitness to understand and cooperate.

■ Nonexperts who have had an opportunity to observe a person may give their opinions of mental condition or capacity based on facts observed, including conversations. Such lay opinions may overcome an expert opinion. (*People v. Chatman* (1986), 145 Ill. App. 3d 648, 495 N.E.2d 1067.) Additionally, the mere fact a psychiatrist expressed the opinion defendant was unfit does not mandate a similar finding by the trial court. The ultimate issue is for the trial court, not the experts, to decide. The credibility and weight to be given psychiatric testimony in a fitness hearing are for the trier of fact. (*People v. Bilyew* (1978), 73 Ill. 2d 294, 383 N.E.2d 212.) The trial court should analyze and evaluate the factual basis for the expert's opinion rather than relying on the ultimate opinions themselves.

Numerous aspects of the factual basis failed to support the experts' opinions in this case. The psychiatrist saw defendant only two times for a total of 2 hours and 20 minutes. Defendant understood the purpose of the visits. He knew who his attorneys were and expressed an opinion about an attorney in one case being better than the one in another case. He understood the charges against him, the role of the judge, jury, and prosecutor, the plea-bargaining system, the nature of motions to suppress, and that his lawyer's role was to help him. Defendant understood court procedures, the possible penalties that might attach to the charges he faced, and the likely outcome of prosecution. The psychiatrist had not observed defendant interact with his counsel before forming his opinion and, therefore, had no personal knowledge of his ability to cooperate with counsel. No physical exam, psychological tests, or intelligence tests were performed. Ninety-five percent of the information on which the diagnosis was based was provided solely by defendant. The psychiatrist stated the diagnosis was not definite and defendant did appear to have some ability to cooper-

ate with his attorney. The court asked defense counsel to make a record of how defendant was unable to assist in his defense. Counsel did not cite any of the problems noted by the psychiatrist.

The psychiatric testimony offered was not persuasive even absent the countervailing lay testimony. A review of the record suggests the psychiatrist was evaluating the defendant's sanity rather than his ability to cooperate. We do not suggest the psychiatrist misperceived his role, but that his evaluation was more enlightening as to defendant's personality than as to his ability to cooperate.

■■ The trial court's own observations of defendant during the fitness hearing were consistent with the lay testimony offered as to defendant's ability to cooperate. The trial court in this case did not err in finding the defendant fit to stand trial. The trial judge carefully considered the totality of evidence before him, and properly considered the testimony of both the expert and lay witnesses. The trial court gave proper deference to the expert's opinion but was not bound to it in light of other evidence received. *Bilyew*, 73 Ill. 2d at 302, 383 N.E.2d at 215.

■■ Defendant alleges the stop of his vehicle was illegal and the evidence seized should have been suppressed. A police officer may stop a person in a public place for a reasonable amount of time when the officer reasonably infers from the circumstances that the person has committed, is committing, or is about to commit an offense. (Ill. Rev. Stat. 1987, ch. 38, par. 107—14.) A reasonable stop must be based upon objective, articulable facts coupled with rational inferences, rather than upon an officer's subjective, nonspecific hunch. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537.) The facts and circumstances as a whole must lead to the conclusion the situation confronting the police officer is so removed from the ordinary that a competent police officer would be expected to act quickly to maintain the status quo. (*McGowan*, 69 Ill. 2d at 77-78, 370 N.E.2d at 539-40.) The probable cause required to arrest or search is not required for a stop. *People v. Smithers* (1980), 83 Ill. 2d 430, 415 N.E.2d 327.

●5 From the testimony elicited at the suppression hearing, the trial court correctly found the stopping of defendant's car was the result of reasonable inferences based upon objective, articulable facts. A surveillance of defendant's home was being conducted due to the possible involvement of its occupants in previous crimes. On May 20, 1988, the police received information defendant's son was involved in a theft from a pickup truck. On May 30, 1988, the police received a report a river cabin had been broken into and a Snapper riding mower

had been stolen. Shortly thereafter, defendant's son was observed operating a Snapper riding mower at defendant's home. A riding lawnmower had never been observed at the residence before. Other residents told the police defendant's son had supposedly found the riding mower near the cabin that was broken into. On July 1, 1988, the police received an anonymous phone call informing them the Bleitners had been leaving for several nights between one and two in the morning and returning home early in the morning hours. Several break-ins of cabins and sheds located near the river had been occurring. The road which defendant's wife and minor traveled at 1:40 a.m. was a secondary road which was primarily gravel. The road ran along the Mississippi River but did not lead to either a bridge or ferry crossing. The road was known not to be used at this hour, and it was reasonably believed the Bleitners did not have any family or business interests in the area. After 50 minutes of driving, the Bleitner car stopped and the dome light came on for about 20 seconds. When it stopped, the car was located approximately 200 feet from a farm house and machine shed. The car turned around and proceeded back toward town.

The reasonable inference from these facts was that the Bleitners were engaging in criminal activity, and the action by the police in stopping the car was permissible. The requirements of *Terry* and section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 107—14) were clearly met in this case. The police had objective, articulable facts from which they could reasonably infer an offense had been committed or was about to be committed.

■ On a motion to suppress evidence, the defendant has the burden to make a *prima facie* showing the evidence was obtained by an illegal search and seizure. (*People v. Neal* (1985), 109 Ill. 2d 216, 486 N.E.2d 898.) A reviewing court will not reverse the trial court's finding on a motion to suppress unless it is determined to be manifestly erroneous. (*People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871.) Such errors are not found here. In fact, this stop was clearly proper and the allegation of error is without merit.

Defendant contends in order to show motive it was only necessary for the jury to know defendant had been charged with a felony and to admit anything more prejudiced the jury. The State's theory of the case was defendant acted in retaliation against Burch for the charge of sexual assault. To prove motive the State introduced evidence concerning the sexual assault charges. This evidence included testimony from Burch involving confrontations with defendant concerning the charges and testimony from John W. Guntren, who was appointed guardian *ad litem* for defendant's other two stepdaughters. The appointment oc-

curred after the sexual abuse charges were filed. Guntren testified defendant said he was going to get the State's Attorney as a result of the sexual abuse charges and juvenile proceedings. Defendant's son also testified accordingly.

As a general rule, evidence of other crimes, *i.e.*, wrongful conduct for which the defendant is not on trial, is inadmissible to prove the defendant has a propensity to commit the charged criminal offense. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) The rationale underlying this rule is such evidence overpersuades the jury the defendant is a bad person deserving punishment. *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.

■ There are exceptions to the general rule. Evidence of other crimes committed by defendant is admissible to show *modus operandi*, intent, identity, motive, absence of mistake, or if it is relevant for any purpose other than to show the propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) To be competent, motive evidence must tend to establish the existence of the motive relied upon. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.) The testimony as to the sexual abuse charges and defendant's reaction does tend to establish the existence of a motive. It was not offered or received to establish a propensity on the defendant's part to commit crime.

■ The probative value of motive evidence must be weighed against its prejudicial impact. (*People v. Reimnitz* (1979), 72 Ill. App. 3d 761, 391 N.E.2d 380.) Evidence of other crimes or charges can substantially prejudice the case of defendant.

■ The evidence here showed defendant's animosity toward Burch grew in correlation with the progression of the sexual abuse charges. The State's evidence was limited and did not exceed the boundaries necessary to establish this fact. Defendant's repeated statements to get the State's Attorney due to the sexual abuse charges give such evidence substantial weight. The jury was instructed upon the receipt of the evidence and at the close of trial to consider the motive evidence only for its limited purpose. Defendant has not demonstrated the jury did otherwise. The probative value of this motive evidence outweighs any prejudicial impact, and it was properly admitted.

Affirmed.

LUND and STEIGMANN, JJ., concur.